Filed 10/6/22 In re A.C. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.C.,<br><br>Defendant and Appellant. | F083841<br><br>(Super. Ct. No. JD142156-00)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Kern County. Marcos R. Camacho, Judge.

Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Alexandria M. Ottoman, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Poochigian, J. and Smith, J.

M.C. (mother) appeals from the juvenile court's dispositional order removing her daughter, A.C., from her custody pursuant to Welfare and Institutions Code section 361, subdivision (c)(1).[1]  She argues there was insufficient evidence to support the court's finding that there would be a substantial danger to A.C.'s physical health, safety, protection or emotional well-being if she were returned to her custody and there were no reasonable means to protect her without removal.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

**A.  Background**

Mother has two children—D.H. (born April 2015) and A.C. (born June 2021). D.H. is involved in separate dependency proceedings and is not part of this appeal; however, his case is closely intertwined with this matter, and we provide relevant information where necessary.

In October 2020, D.H. was removed from mother's custody due to ongoing domestic violence with her boyfriend (M.C.).  In February 2021, at D.H.'s combined jurisdiction and disposition hearing, the juvenile court sustained the petition and ordered mother to participate in reunification services, including parenting/child neglect counseling, domestic violence as a victim counseling, random drug testing, and supervised visits.

In February and March 2021, mother called police on two occasions after she got into verbal altercations with M.C. while he was at her house.  In April 2021, social workers went to mother's house and found M.C. there.  By that time, mother had already completed a 10-week parenting/child neglect program and a 15-week domestic violence class.

In May 2021, mother obtained a restraining order against M.C.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

**B. Referral and Petition**

In June 2021, the department received a referral on behalf of A.C. after mother allowed M.C. to be present in the delivery room during A.C.'s birth. The department contacted mother shortly after she and A.C. were discharged from the hospital to initiate an investigation. Initially, mother denied M.C. had been at the hospital, but eventually admitted he was there and cut the umbilical cord. She said he left once A.C. was born. Mother was not sure whether M.C. was A.C.'s father and he was aware he might not be the biological father. The social worker informed mother the department was concerned with her ongoing relationship with M.C., but mother denied they were in a relationship. Days later, a social worker contacted mother again. Mother reported the last time she spoke to M.C. was on the date of A.C.'s birth, but that he had been calling her and leaving voice messages. She had not returned his calls. The social worker told mother she needed to apply what she learned in her domestic violence classes. Mother agreed she should not have let M.C. be present during A.C.'s birth. Later that same day, mother sent the social worker a text message stating that M.C. showed up at her house and she was waiting for police to arrive.

The department subsequently filed a petition pursuant to section 300, subdivisions (b) and (j) on behalf of A.C., alleging she was at substantial risk of suffering serious physical harm due to mother's inability to adequately supervise or protect her from ongoing domestic violence with M.C. The department summarized D.H.'s dependency proceedings and stated that mother continued to have contact with M.C. and allowed him to be present at A.C.'s birth despite D.H.'s removal and the active restraining order. The department noted that although mother had completed domestic violence classes, she continued to show poor judgment as she was still in contact with M.C., which placed A.C. at risk. The petition further alleged D.H. had been found to be abused or neglected and there was a substantial risk A.C. would be abused or neglected as well. The petition listed M.C. and A.H. as alleged fathers.

3.

**C. Detention**

The detention report showed mother had 11 prior child welfare referrals,[2] at least five of which involved severe domestic violence incidents with D.H.'s father and M.C.[3] In May 2016, during an altercation with D.H.'s father, mother pulled a knife out on him and was arrested for felony domestic violence and felony dissuading a witness. At some point, D.H.'s father obtained a restraining order against her. In June 2020, during an altercation with M.C., mother attempted to run him over and drove through a fence while D.H. was in the car with her. In October 2020, she stabbed M.C. with a knife in D.H.'s presence and a warrant was issued for her arrest for assault with a deadly weapon and felony domestic violence. During the investigation of one referral, mother reported she had previously obtained an emergency protective order against M.C. because he had strangled her. However, she did not make it a permanent restraining order and continued her relationship with him. That incident was not reported to child protective services because D.H. was not present.

Additionally, there was one referral in November 2020 against M.C. in which D.H. reported that "[M.C.] hit him, punched him and slammed [him] on the ground." D.H. said, "I did bad things. I sleep with older guys. They hit me, punch[,] and do other stuff to me." He could not describe what "other stuff" meant. D.H. wished M.C. was gone. The referral stated D.H. had been removed due to domestic violence between mother and M.C. M.C. had a long history of child welfare referrals involving another woman and their children.

---

**2**     The detention report showed mother had 14 referrals, but three were duplicate referrals that were made on a different day or in a different county.

**3**     Two referrals involved domestic violence incidents with D.H.'s father—one referral was evaluated out and one was substantiated. Three referrals involved domestic violence incidents with M.C. and were all substantiated.

On June 30, 2021, at the detention hearing, the juvenile court ordered A.C. detained from mother and ordered she be provided with reunification services and supervised visits.

**D. Jurisdiction**

On July 8, 2021, mother was assessed for codependency counseling, but did not meet the criteria for services and was referred to individual and family counseling. Thereafter, mother began attending weekly individual counseling sessions. Additionally, mother submitted to three random drug tests and tested negative each time.

On July 18, 2021, mother called police and reported she was sleeping at home when M.C. crawled in through her window and attacked her with a towel. M.C. fled before police arrived. Mother wanted him arrested for violating the restraining order. She informed the officers that M.C. had gone to her house the previous week to drop off dog food. The officers noted mother did not report M.C. for violating the restraining order the previous week. Due to the lack of evidence, only a report was made.

On July 19, 2021, mother called police while she was at her stepfather's house to report that M.C., who was across the street at his parents' house, had been harassing her and texting her all day. M.C.'s parents lived across the street from mother's stepfather's house. When police arrived, M.C. was exiting his parents' front yard. Officers spoke to his parents who reported that, to their knowledge, M.C. lived with mother. M.C. was arrested for violating the restraining order. While being arrested, M.C. told officers he had sex with mother every night and stayed with her.

On September 30, 2021, the juvenile court held A.C.'s jurisdiction hearing along with D.H.'s six-month review hearing, noting the cases were "linked in many ways." Mother testified she invited M.C. to the hospital when A.C. was born and did not tell hospital staff about the restraining order because she was not "thinking clearly" due to being in labor. She stated, "I felt that there wasn't a threat due to security at the hospital and the nurses coming back and forth into my room."

5.

Regarding the incident on July 19, 2021,[4] she said she called police to report that while she was at her stepfather's house, M.C. would not stop harassing her, telling her that he was going to vandalize her car if she did not go outside to talk to him. He was across the street at his mother's house. She finally saw him and told him she was going to call the police if he did not leave her alone. She eventually did call the police to report him. Mother was not aware M.C.'s mother told officers that M.C. lived with her. She denied living with him. Mother further testified that on July 17, 2021,[5] M.C. broke into her house and she reported the incident to police. Police went to her home and made a report, but told her there was nothing they could do because M.C. had not been served with the final restraining order. She had a friend serve him the next day. Mother claimed she did not see M.C. from the date of A.C.'s birth to when he broke into her house.

On cross-examination, mother admitted she continued to communicate with M.C. after the restraining order was granted. She said she attempted to block him from her cell phone several times, but he would use someone else's phone to contact her. She considered changing her phone number, but had not done so. County counsel pointed out that she showed officers text messages she received from M.C.'s phone number and asked why she had not blocked his number. She said she did block his phone number, but he called from other numbers. She denied knowing that M.C. told police they were living together and having sex every night. She said the last time she saw him was on July 19, 2021, but that he continued to leave her voicemails.

On redirect examination, mother testified that the text messages she showed the officers came from "a number that [she] knew recently to be his number due to him leaving the voicemails when the number was blocked and also a number that one of his

---

[4] During testimony, mother referred to July 18, 2021, as the date in which she reported M.C. while at her stepfather's house but the record shows that incident occurred on July 19, 2021.

[5] The correct date of the break-in is July 18, 2021.

friends used to call." She said she had blocked "[a]t least two handfuls" of phone numbers. She testified she could adequately protect her children by enforcing the restraining order. She would call police and have him arrested for violating the restraining order. She did not want to continue communicating with him or have a relationship with him due to "the severity of the domestic violence and to keep [her] children safe." She said she learned a lot in codependency classes and individual counseling.

The juvenile court sustained the petition and set a disposition hearing. It also continued D.H.'s six-month review hearing because it felt A.C.'s disposition report would be very important to D.H.'s case as well.

**E. Disposition**

A report prepared prior to the disposition hearing stated the department was concerned because A.C. had been returning from visits at mother's house smelling like cigarette smoke. She did not smell like that when visits occurred at the visitation center. This was concerning because M.C. had been seen smoking in mother's living room before. Mother did not smoke. When asked about the smell, mother blamed it on her heater. During an inspection of mother's home, two social workers noticed the heavy smell of cigarette smoke in mother's living room, which she again blamed on the heater. Additionally, the report stated that in October 2021, a social worker overheard mother telling D.H. that she would " 'pop' " him if he did not stop drinking her soda. When asked about the statement, mother became defensive, stating that she was not going to be told how to raise her children and that she would " 'whoop' " them if she had to because it was not illegal. She proceeded to say that " 'Black children need to be whooped.' " The social worker encouraged mother to avoid threats or hitting and provided her with tips and ideas on how to address concerns.

On January 6, 2022, the juvenile court held A.C.'s disposition hearing and D.H.'s six-month review hearing. Social worker Angelina Sanchez testified the department was

concerned that mother would "get[] back" with M.C. due to their domestic violence history, even though there was no evidence they had been in contact in recent months. She said the department was recommending family reunification services for D.H. and not family maintenance because mother had made comments about physically disciplining him. Additionally, there were concerns that M.C. was visiting mother's home because when the children returned from mother's home, they came back smelling like cigarette smoke. Additionally, mother had not completed her case plan and the department wanted her to have more time to demonstrate that she had truly changed her behavior so that the children would be safe. Moreover, mother had possible felony charges pending. The department was worried mother had not learned from her domestic violence classes because she completed the classes before A.C.'s birth and she still asked M.C. to attend the birth.

Social worker Bianca Mendez testified she had a conversation with mother about "popping" D.H. Mendez asked mother what she meant by "popping" him and she said it was a form of punishment. It meant "[h]itting or whooping." Mother said she would hit him on the hand if she needed to as hitting was not illegal. When asked what the current risk to the children was if they were returned home, Mendez stated D.H. appeared "very coached" by mother and was discouraged from talking to department staff. Mendez did not believe mother had changed based on their conversations.

Social worker Jennifer Rodriguez testified A.C. would be at risk if returned to mother's custody because she could not speak, defend herself, or report what was going on in the home. The department was also concerned that mother had individuals around that were not supposed to be there. She acknowledged there was no evidence mother had been in contact with M.C. since June or July 2021, "but there [was] concern regarding the smoking." She said that if A.C. were returned to mother's custody, the department would be concerned about who was around and whether mother had learned to protect her.

8.

Mother's counsel argued the children should be returned to mother's custody on a family maintenance plan. Minors' counsel argued that after hearing the evidence, mother should have increased visitation with discretionary unsupervised visits before moving to family maintenance. County counsel argued it was concerning that mother had made statements about threatening to hit D.H. because the children's removal was caused by domestic violence. Specifically, mother had been a perpetrator and used violence to resolve issues. The department was not convinced she had changed her behavior. In ruling, the court stated as follows:

> "As to the issue of whether the Court is going to order [f]amily [r]eunification [s]ervices, I think the evidence presented to the Court and the evidence in the social study reports do create a concern for the Court in terms of whether [mother] is yet there in terms of being able to provide a safe environment for these children. I understand that there[] ha[s] been no physical evidence in terms of contact with [M.C.] in the last couple months. But as [minors' counsel] pointed out, he was present at the hospital at the birth of the child, [A.C.]. So there is concern on the Court's part[] as to whether [mother] fully understands what she learned in domestic violence classes regarding staying away from [M.C.]. We do have the evidence of the smoke in the home, which although is not conclusive that is [M.C.] or somebody else, we do know mother doesn't smoke. Those both are testimony to the Court to say someone else was in the home that was smoking, and we do know [M.C.] smokes. So again, that is a concern the Court has. Mother hasn't finished her case plan yet. Most likely [h]as started it, but I think just in totality of the circumstances, specifically the issue the mother has had in the past with the domestic violence, I think there is sufficient evidence here for the Court to find that … these children would be in substantial danger if they would be returned to the mother at this time. I tend to agree with [minors' counsel] that maybe the best thing to do at this point is to start increasing visits with mother. Hopefully leading to unsupervised visits. So I'll give the [d]epartment discretion to do that. But again[,] based on the totality of the circumstance[s], the Court is going to go ahead and find at this time the appropriate orders would be for the mother to have [f]amily [r]eunification [s]ervices with both children."

The juvenile court found by clear and convincing evidence that there was a substantial danger to the physical health, safety, protection, or emotional well-being of

9.

A.C. if she were returned to mother's custody. The court ordered her removed and found mother had made moderate progress toward alleviating or mitigating the causes necessitating placement. Mother's reunification services were continued with supervised visits. M.C. and A.H. remained alleged fathers as they failed to participate in paternity testing and were not provided with services.

On February 2, 2022, mother filed a notice of appeal.

## **DISCUSSION**

Mother contends the juvenile court's removal findings and orders are not supported by substantial evidence because she actively avoided voluntary contact with M.C. and there were reasonable alternatives to protect A.C. without removing her from her custody. We disagree.

"A dependent child shall not be taken from the physical custody of his or her parents … with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence … [¶] (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … custody." (§ 361, subd. (c)(1).)

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) Therefore, California law "requires that there be no lesser alternative before a child may be removed from the home of his or her parent." (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284.) But " ' "[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child."

[Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

"On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 ["when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].) "Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005.) " ' "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." ' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 995–996.)

In the present case, A.C. was removed due to mother's ongoing domestic violence with M.C. (See *In re I.R.* (2021) 61 Cal.App.5th 510, 521 ["domestic violence poses [a serious threat] to a child's physical and emotional well-being"]; *In re V.L.* (2020) 54 Cal.App.5th 147, 156 ["Even if a child suffers no physical harm due to domestic violence, a 'cycle of violence between … parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." ' "].) Substantial evidence shows that removing A.C. from mother's custody was necessary to protect her physical and emotional well-being,

11.

and there were no other reasonable means to protect her without removal. (§ 361, subd. (c)(1).)

The record shows mother had a significant history of engaging in domestic violence dating back to 2016. She had 11 child welfare referrals, at least five of which involved serious domestic violence incidents. Mother was the victim in some instances, and the perpetrator in others. She had been arrested at least twice for perpetrating domestic violence and had charges pending for a separate incident. These incidents occurred in front of D.H., and one incident in particular put D.H. in substantial danger. During an altercation with M.C., mother attempted to run him over and drove through a fence with D.H. in the car. Mother's ongoing domestic violence problems ultimately led to D.H.'s removal.

But even after D.H.'s removal, mother continued her toxic relationship with M.C., exposing herself to continued domestic violence. In February and March 2021, M.C. was at mother's house on two occasions and they engaged in verbal altercations requiring police intervention. At that time, mother was already pregnant with A.C. Thereafter, in April 2021, mother again allowed M.C. to be at her house. In May 2021, mother finally obtained a restraining order against him.[6] By that time, mother had already completed her parenting and domestic violence classes. Evidently, neither D.H.'s removal, nor a restraining order or domestic violence classes, were sufficient to keep mother away from M.C. because she then proceeded to invite him to the hospital during A.C.'s birth.

Mother argues she actively avoided contact with M.C. after A.C.'s birth. We acknowledge that the record shows mother reported M.C. for three restraining order

---

[6]    We note that the May 2021 restraining order against M.C. was mother's second restraining order against him. Mother had previously obtained an emergency protective order against M.C. after an incident in which he strangled her, but she did not follow through with a permanent order and instead continued her relationship with him. (See *In re R.C.* (2012) 210 Cal.App.4th 930, 942 [" ' "[P]ast violent behavior in a relationship is 'the best predictor of future violence.' " ' "].)

12.

violations after A.C. was born. These incidents occurred approximately five to six months prior to the disposition hearing. The juvenile court, however, could have reasonably concluded mother was still in contact with M.C. in light of the contradictory evidence before it. For instance, during the July 18, 2021 break-in to mother's house, mother told officers M.C. had gone to her house and dropped off dog food the week before. Mother did not report that restraining order violation. Additionally, during the July 19, 2021 incident that occurred at mother's stepfather's house, mother showed police officers text messages she received from M.C.'s phone number, even though she claimed to have blocked his number. That same day, M.C.'s parents told officers they believed M.C. was living with mother, and M.C. reported he was having sex with mother every day and staying with her. Additionally, there was evidence that A.C. returned from mother's house smelling like cigarette smoke, but did not smell like that when visits occurred at the visitation center. Mother did not smoke, but M.C. had been seen smoking in mother's living room. Thus, the court could have reasonably concluded mother was still in contact with M.C., putting A.C. at risk if she were returned to mother's custody.

Moreover, we note that mother's statements about physically disciplining her children further indicated mother had not yet learned to apply what she learned in parenting and domestic violence classes by the time of the disposition hearing. She continued to believe that using violence was an acceptable method to solve her problems.

Mother claims the department did not consider alternatives to removal, but mother's counsel specifically questioned the social workers about family maintenance and the risk of returning A.C. to mother's custody at the disposition hearing. Social worker Rodriguez testified A.C. would be at risk if returned to mother's custody because she could not speak, defend herself, or report what was happening in the home. Additionally, mother's counsel, minors' counsel, and county counsel addressed this point in argument. On appeal, mother does not identify alternative measures the department could have taken to ensure A.C.'s safety other than her removal.

We conclude substantial evidence supports the juvenile court's dispositional findings that removing A.C. from mother's custody was necessary to protect her physical and emotional well-being, and there were no other reasonable means to protect her without removal.

## **DISPOSITION**

The juvenile court's dispositional order is affirmed.